IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 12, 2008 Session

## HAROLD WAYNE HARRIS v. SHERRY EDWARDS, ULYSES EDWARDS and CARL VANCE HARRIS

**Direct Appeal from the Chancery Court for Rhea County**
**No. 9970     Hon. Jeffrey F. Stewart, Chancellor**

**No. E2007-01772-COA-R3-CV  - FILED MAY 14, 2008**

Plaintiff brought this action to void two deeds executed by the deceased shortly before he died. Plaintiff sought to void the deeds on the grounds that the grantees of the deed exerted undue influence on deceased in obtaining the deeds and that deceased was not competent to make the deeds.  In a bench trial, the Chancellor held that plaintiff did not prove undue influence and that the deceased was fully competent to contract and execute the deeds.  On appeal, we affirm the Judgment of the Trial Court.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Chancery Court Affirmed.**

HERSCHEL PICKENS FRANKS, P.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, J., and SHARON G. LEE, J., joined.

M. Keith Davis, Dunlap, Tennessee, for appellant, Harold Wayne Harris.

Rebecca L. Hicks, Dayton, Tennessee, for appellees, Sherry Edwards, Ulyses Edwards and Carl Vance Harris.

**OPINION**

        In this action to set aside warranty deeds, the petitioner alleged that he was the biological son on the deceased grantor, and that respondents, Carl Vance Harris and Sherry Edwards are also the grantor's biological children.  Further, that the deceased, Carl Henry Harris, died on the 7th day of June, 2004, having become ill with cancer several months earlier, and that approximately

three days prior to his death, the grantor arranged with an attorney to prepare a deed and bring it to his home to execute. That the grantor executed the deed, conveying real estate to Carl Vance Harris, with grantor retaining a life estate, and on the same date grantor executed a deed in which he conveyed the remainder interest in the tract of real estate to Sherry Edwards and Ulyses Edwards, and retained a life estate. The Complaint concluded that the defendants unduly influenced decedent to execute the deeds when he was incompetent, ill and near death. Plaintiff prayed that the two deeds at issue be set aside and that he be awarded his share of decedent's estate as he had died intestate.

After answers, the trial was conducted by the Chancellor who issued a Memorandum Opinion and Final Judgment. The Judgment was based on the Chancellor's Memorandum Opinion wherein he made the following findings of fact:

1.  The parties are the children and son-in-law of Henry Harris, who died on June 7, 2004. The decedent conveyed all of his real estate to defendants, Sherry and Ulyses Edwards and Carl Vance "Bobby" Harris. Plaintiff, Harold Wayne "Wayne" Harris, alleges that the transfer of property was due to a confidential relationship between the decedent and Sherry Edwards and her exercise of undue influence over her father. Wayne Harris also alleges that the decedent lacked the mental capacity to execute the deeds in question.

2.  Henry Harris had a history of lung cancer which was diagnosed and treated in late 2003. In May 2004 Mr. Harris learned that the cancer had reoccurred and he met with his attorney, Gary Fritts, on June 2, 2004 to discuss the preparation of the deeds in question. The deeds were executed by Henry Harris and notarized by Gary Fritts on June 4, 2004.

3.  Henry Harris died on June 7, 2004.

4.  The farm in question was a generation to generation farm and it was important to Henry Harris that the farm remain within the family. The Defendants had been most involved in the operation of the farm with Henry Harris although plaintiff had helped with the operation at times.

5.  Henry Harris was a strong-willed man who made his own decisions.

6.  Gary Fritts had been Henry Harris' friend and attorney for over thirty years.

7.  Henry Harris discussed estate planning with Gary Fritts when he was diagnosed with cancer in October 2003. Henry Harris' plan was to transfer the farm to the Defendants and to omit his son, Wayne Harris. Wayne Harris has a longstanding history of alcohol use. There was evidence that Wayne Harris abuses alcohol and there was evidence to the contrary. The evidence did show that Henry Harris was concerned about Wayne Harris' alcohol use

and, according to at least one witness, Henry Harris was concerned that Wayne Harris might convey the farm away given the opportunity.

8.    Henry Harris' medical condition improved for a time after treatment and the urgency to attend to estate planning passed. The cancer returned in an aggressive form in May 2004.

9.    Two medical experts, Dr. Stuart Bacon and Dr. Darrell Johnson, testified regarding Henry Harris' mental capacity. Dr. Bacon, Henry Harris' family doctor, last saw Mr. Harris on May 28, 2004 and he opined that on that date Mr. Harris was mentally competent. Dr. Bacon further reviewed Dr. Johnson's notes from a June 1, 2004 visit with Mr. Harris. Dr. Bacon concluded from these notes that Mr. Harris was mentally competent on June 1, 2004. Dr. Johnson, Mr. Henry Harris' oncologist, was of the opinion that Henry Harris was unable to understand legal formalities due to his rapid physical deterioration. However, Dr. Johnson acknowledged that he had not ever assessed Henry Harris for his mental competence to handle legal affairs.

10.    Numerous witnesses expressed their lay opinions regarding Mr. Henry Harris' mental capacity between June 1, 2004 and June 4, 2004. Some of the witnesses believed him to be competent and some did not.

11.    The Trial Court focused on the testimony of Gary Fritts, a practicing member of the Rhea County Bar Association for many years and a former General Sessions Judge, who was a friend of and attorney for Henry Harris for many years. Mr. Fritts testified that he met with Henry Harris and discussed the transfer of the property and the nature of the transaction. He believed Henry Harris to be mentally competent to make his decisions during this discussion. On June 4th he presented the two deeds to Henry Harris for him to make his mark on. He read the content of the deeds to Henry Harris. He also testified that he read the Affidavit of Acknowledgment to the witnesses as well, although one of the witnesses denied this fact. Gary Fritts did not benefit from the transaction in any way.

12.    The hospice nurse visited Henry Harris on June 4, 2004. The nurse found Henry Harris oriented to time, place and circumstances. He was in a great deal of pain.

13.    The defendants established clearly and convincingly that Henry Harris received proper independent advice regarding this transaction.

Based on these findings, the Chancellor concluded:

1. That there was no showing of a confidential relationship coupled with undue influence. While defendants had close relationships with Henry Harris, the evidence showed that he was the dominant figure in these relationships.

2. There are no discrepancies between the effect of the deeds and Henry Harris' expressed intentions as stated to his attorney. Thus, the transfer did not result in any unjust or unnatural result.

3. The Trial Court found that Henry Harris was mentally competent at the time he executed the deeds and that Plaintiff had failed to meet his burden of proof in order to set aside the deeds.

Plaintiff raises these issues on appeal:

A. Did plaintiff/appellant meet his burden of showing the existence of a confidential relationship?

B. Did defendants/appellees rebut the presumption of undue influence?

C. Did defendants meet their burden of showing that the decedent received proper independent advice?

D. Did plaintiff/appellant meet his burden of showing that the decedent was not mentally competent?

In this Court, a trial court's factual findings are presumed to be correct, and this Court will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d) (2006); *Bogan v. Bogan,* 60 S.W.3d 721, 727 (Tenn.2001). We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn.1993). When the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial court who has the opportunity to observe the witnesses' manner and demeanor while testifying is in a far better position than this Court to decide those issues. *McCaleb v. Saturn Corp.,* 910 S.W.2d 412, 415 (Tenn.1995). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *In re Estate of Walton v. Young,* 950 S.W.2d 956, 959 (Tenn.1997).

Plaintiff argues that the deeds at issue should be set aside and voided, due to the undue influence of Defendants. The doctrine of undue influence is well established in Tennessee and transactions by which one party is granted a gratuitous benefit from another party are void if the grantee is shown to have exercised undue influence over the grantor to obtain the relief. *Brown v. Weik,* 725 S.W.2d 938, 944 (Tenn. Ct. App.1983). In this case the evidence shows that a normal father/child relationship existed between Henry Harris and the defendants. The existence of a

normal father/child relationship is not the same as a *per se* confidential relationship in law, which would raise the presumption of invalidity as to a benefit bequeathed to one party to the relationship by the other. *Iacometti v. Frassinelli,* 494 S.W.2d 496, 499 (Tenn. Ct. App. 1973). Relationships between family members are not confidential *per se* and will only be found to be confidential where confidence is placed by one party in the other party and the recipient of the confidence is the dominate personality in the relationship with the ability arising out of the confidence to influence and exercise dominion over the weaker or dominated party. *Iacometti* at 499; *Kelley v. Johns,* 96 S.W.3d 189 at 197. The mere fact that the grantor and grantee are members of the same family does not give rise to an inference or presumption of undue influence. *Iacometti* at 499.

The party who claims the existence of the confidential relationship has the burden of proving such relationship by a preponderance of proof. In addition to proving that a confidential relationship exists among family members, the contestant to the transaction must establish at least one other suspicious circumstance, such as a transaction which benefits the dominant party to the confidential relationship. *Kelley,* at 197. Under the circumstances presented here, where a deed has been executed, proof that the grantor was in receipt of independent advice before entering into the transaction is often presented to rebut the presumption of undue influence. *Matlock,* 902 S.W.2d at 386.

In this case, the Trial Court concluded that while Henry Harris and his daughter Sherry had a close relationship, it was not a confidential relationship giving give rise to a presumption of undue influence. The Court noted that Henry did rely on Sherry to take him to his medical appointments. This reliance, however, is within the scope of the normal father-daughter relationship, since Henry was ill and undergoing treatment for cancer. He needed transportation and support, and Sherry was available and willing to assist her father. These are not the type of circumstances that can be characterized as Sherry maintaining dominion and control over her father to the extent that a confidential relationship was created. The Trial Court also addressed the farming relationship between Henry, his son Bobby and son-in-law Ulyses and found that if anyone dominated this relationship, it was Henry. The evidence does not preponderate against the Trial Court's findings. Tenn. R. App. P. 13(d). *See also, Pittman v. Pittman*, No. M2006-01256-DOA-R3-CV, 2007 wl12172070, 8-9 (Tenn. Ct. App. April 24, 2007).

The Trial Court focused on the testimony of Gary Fritts, Henry Harris' long time friend and attorney. Mr. Fritts testified that he had talked to Henry many times over a long period of time regarding Henry's intention to deed a portion of the farm to Sherry and Ulyses and the rest of the farm to Bobby. Fritts also testified that Henry had expressed his intention to disinherit Wayne during these conversations. Fritts' recollection of Henry's often stated intent to dispose of the farm in this manner was verified by the testimony of numerous other witnesses with whom Henry had shared his intentions. Additionally, there was overwhelming evidence that Henry was a "strong-willed man", "who knew what he wanted." Dr. Bacon commented on this aspect of Henry's character which he demonstrated during the last visit Henry had with Dr. Bacon. The evidence clearly demonstrated that the deeds Henry executed in the last days of his life were in keeping with his long held intentions coupled with Henry 's universal reputation as "strong willed" refute a finding

that the defendants used their family relationship with Henry to dominate and control him with regard to the disposition of the farm. The Trial Court, who had the benefit of hearing the testimony of the witnesses on this issue, was in the best position to measure their credibility. Since no confidential relationship was established, the presumption of undue influence did not arise, and no rebuttal on this issue was triggered.

Finally, plaintiff contends that the deeds at issue should be set aside because Henry Harris was not mentally competent when he executed the deeds on June 4, 2004, and asserts that a deed executed by a mentally unbalanced grantor with no intelligent comprehension of the act being performed is void. *Bright v. Bright,* 729 S.W.2d 106, 109 (Tenn. App.1986).

Plaintiff is seeking to rescind the deeds on the grounds of mental incapacity of the grantor and has the burden of proof on this issue. *Fell v. Rambo,* 36 S.W.3d 837, 846 (Tenn. Ct. App. 2000). The mental capacity required to execute a warranty deed is essentially the same and equates to the mental capacity required to enter into a contract. *In re Conservatorship of Davenport,* No. E2004-01505-COA-R3-CV, 2005 W L 3533299 at * 17 -18 (Tenn. Ct. App. Dec. 27, 2005). In *Roberts v. Roberts,* 827 S.W.2d 788 (Tenn. App.1991), this Court considered the issue of mental capacity to execute instruments and relied on the following language from C.J.S. :

> The test of mental capacity to contract is whether the person in question possesses sufficient mind to understand, in a reasonable manner, the nature, extent, character, and effect of the act or transaction in which he is engaged; the law does not gauge contractual capacity by the standard of mental capacity possessed by reasonably prudent men. It is not necessary to show that a person was incompetent to transact any kind of business, but to invalidate his contract it is sufficient to show that he was mentally incompetent to deal with the particular contract in issue, ...
>
> On the other hand, to avoid a contract it is insufficient to show merely that the person was of unsound mind or insane when it was made, but it must also be shown that this unsoundness or insanity was of such a character that he had no reasonable perception or understanding of the nature or terms of the contract. The extent or degree of intellect generally is not in issue, but merely the mental capacity to know the nature and terms of the contract.
>
> * * * *
>
> In the final analysis, contractual capacity is a question to be resolved in the light of the facts of each case and the surrounding circumstances.

*Roberts,* 827 S.W.2d at 791-92 (quoting 17 C.J.S. *Contracts* § 133(1)(e)).

This treatise now gives further guidance specific to donations of property:

The general rule . . . is that, if the donor has sufficient mental capacity to comprehend the transaction, if he understands the extent and value of his property, what persons are the objects of his bounty, and the manner in which he is distributing his property among them, his gift will be valid.  CJS GIFTS § 13.

Thus the test to be applied here is whether the grantor had a reasonable understanding that he was permanently conveying a certain portion of his  farm by deed to his daughter Sherry and her husband Ulyses and that he was conveying the remainder of his farm to his son Bobby, while retaining a life estate.  The evidence demonstrates that Henry had planned on conveying the farm to Sherry, Ulyses and Bobby for years and that upon receiving the diagnosis of cancer in October 2003 he began to put his plan into action when he asked Sherry to draw up the map of the portion he had promised to her and Ulyses.  As he weakened during the Spring of 2004 he spoke to Gary Fritts about his estate plan and in the last week of his life he met with Mr. Fritts to finalize his plan.  Further he met with his daughter Judy and explained how and to who the farm would be conveyed.  The deeds he executed on June 4th exactly reflected the estate plan he had discussed with multiple witnesses.  The Trial Court, in finding that the grantor had the mental capacity to execute the deeds, relied on the testimony of Gary Fritts who had known Henry as a friend and client for thirty years, and had discussed the estate plan with Henry many times over many years.  Fritts testified that Henry's mental state was good during the meeting two days before the deeds were executed, and Henry was able to provide him with information he needed to draft the deeds.  Fritts also testified that he read the completed deeds aloud to Henry on June 4th and questioned Henry as to his understanding of the deeds.  Fritts was firm in his belief that Henry knew what he was doing when he signed the deeds, as well as the witnesses to Henry's execution of the deeds.

The Trial Court considered the testimony of all the witnesses and put particular emphasis on the testimony of Fritts regarding Henry's mental capacity at the time he executed the deeds.  Based upon the evidence, the Trial Court held that Henry Harris was mentally competent when he executed the deeds.  In this connection *see, Daniel v. Hopson,* CA No. 730, 1988 WL 1734 (Tenn. App. Jan 15, 1988).

For the foregoing reasons, we affirm the Trial Court's Judgment, finding there was no confidential relationship between Henry Harris and the defendants, and the Trial Court's determination that Henry Harris had the mental capacity to execute the deeds.

We assess the costs to Harold Wayne Harris.

_____
HERSCHEL PICKENS FRANKS, P.J.